**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TONY GOODRUM, | Case No.: 11cv2262 AJB (JMA) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION: (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS; and (2) DENYING REQUEST FOR EVIDENTIARY HEARING** |
| CYNTHIA TAMPKINS, | |
| Respondent. | |

## I.    INTRODUCTION

Petitioner Tony Goodrum, a state prisoner represented by counsel, has filed a Second Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet.") challenging his convictions in San Diego Superior Court case no. SCD170068 for voluntary manslaughter and use of a firearm and possession of a firearm by a felon. (Pet., ECF No. 75.)[1] Goodrum contends the prosecution presented perjured testimony at his trial and his counsel was ineffective. (*Id.* at 47-113.) He also asks for an evidentiary hearing. (*Id.* at 113-20.)

/ / /

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system, except for lodgments.

The Court has read and considered the Petition, the Memorandum of Points and Authorities in Support of the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer ("Answer") [ECF No. 83], the Traverse and Memorandum of Points and Authorities in Support of the Traverse [ECF Nos. 88], the lodgments, and the legal arguments presented by both parties. For the reasons discussed below, the Court **RECOMMENDS** the Petition and request for an evidentiary hearing be **DENIED**.

## II.   FACTUAL BACKGROUND

 This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recounted the facts as follows:

> Goodrum lived with his girlfriend Ieisa Wilson, her two children, and another couple in a house on Brookhaven Road. Goodrum and the victim Dwayne Stamps, were friends. About a year earlier Stamps had rented a room in the Brookhaven house for a few months. In the past, Goodrum and Stamps had argued, even to the point of pushing or shoving each other, but they had never had a fist fight and Stamps had never made any threats to kill Goodrum or anyone else. Goodrum and Stamps had not seen each other for several months. Some animosity had developed between them because Stamps had borrowed and not returned Wilson's car (Wilson and Goodrum viewed it as a theft of Wilson's car).
>
> On September 24, 2002, Stamps had been terminated from a drug rehabilitation program, his girlfriend Lorraine Murray had complained about not being happy with the relationship, and he had backed her vehicle into a pole or tree, damaging it. After stopping at a bar, Stamps and Murray drove to the Brookhaven residence, arriving about 9:00 p.m. At the time of his death, about 30 minutes later, Stamps had a blood alcohol level of .17 percent.

/ / /

When Stamps and Murray arrived, the garage door to the Brookhaven residence was propped open six to seven inches with a pipe. The lights were on in the garage, which was often used by the residents of the house as an additional living space. Goodrum was inside the garage with a woman playing dominoes. Goodrum, the woman, and her friend had used methamphetamine that day "for a few hours at least."

When Stamps knocked loudly on the garage door, Goodrum responded by opening the door. Stamps walked in and said he was looking for Jason Cruz who had his earring and other belongings. He was rude to the woman, suggesting in a lewd manner that he knew her and told her that if she saw Cruz to tell him that he was going to kill him.

Stamps entered the house, took Wilson into the bedroom and accused her of saying "mean things" about him. According to Wilson, Stamps threatened to kill her. When Goodrum entered the bedroom, Stamps accused Goodrum of having his diamond earring. Goodrum said the earring was in a duffel bag, which he took out of a closet, carried out to the garage, and set down in from of Murray's vehicle. Stamps and Goodrum argued in the garage and exchanged blows both in the garage and in front of Murray's vehicle. According to Goodrum, Stamps said he was going to get a gun and shoot everyone in the house.

Stamps went to Murray's vehicle and pulled out a roofing hammer, which was described as looking like a tomahawk, hatchet, or axe. According to Goodrum, Stamps threatened, "I'm gonna fuck you up. I'm gonna fuck you up." Goodrum pulled out a knife and picked up a trash can with his other hand. The men continued arguing but did not raise their weapons. Goodrum told Stamps to leave.

There were other people in the garage area, including the woman with whom Goodrum had been playing dominoes, Murray, and Goodrum's friend Howard Herring. According to some of the witnesses, things calmed down; both men put down their weapons, they hugged, Stamps apologized, and said he loved Goodrum as a brother. According to Goodrum, things did not calm down. Stamps made a comment that he was "gonna get [his] strap and shoot everybody in the house." Goodrum responded he was going into the house and when he came back he was "gonna be shootin' sparks." Goodrum retrieved a rifle from between the mattress and box springs of the bed in the master bedroom. He cocked the rifle in the bedroom.

When Goodrum entered the garage with the rifle, Stamps stood near the rear of the driver's side of a car parked in the garage. When Stamps became aware of the gun, he said something like, "Go ahead and shoot me." According to several witnesses, including neighbors, Stamps was not holding anything in his hands. A neighbor across the street saw Goodrum advance toward Stamps. Herring and Goodrum, as well as another neighbor, testified Stamps started walking towards Goodrum. Goodrum fired twice at Stamps, hitting him once in the head and once in the chest.

Herring testified that after the first shot, Stamps turned, grabbed his stomach and said something like, "I can't believe you shot me." Herring saw blood in the area of Stamps's heart. As Stamps turned, Goodrum fired a second shot and Stamps collapsed to the ground. According to Murray, the first shot hit Stamps in the face and he staggered. The second one hit him in the heart, he fell to the ground, and Goodrum was preparing to fire again when Murray shouted at him to stop.

According to Goodrum, when he entered the garage, Stamps commented in a sarcastic or mocking tone of voice, "Oh, he's got a gun. What are you going to do with a gun?" Goodrum thought Stamps was hiding something behind his back, possibly a gun. Stamps kept advancing despite Goodrum's warning that he was "a damn good aim." Goodrum fired when Stamps started moving a pipe from behind his legs. After the first shot, Stamps continued to swing the pipe up, so Goodrum fired again. A pipe was later found near Stamps's body.

Stamps died as a result of the gunshot wounds, either of which was potentially fatal. The head wound likely would have caused immediate unconsciousness and it would have been unlikely Stamps would have been able to speak or move after the wound was inflicted. The barrel of the rifle was two feet or further from the head wound when it was inflicted. In contrast, the barrel of the rifle was touching or nearly touching Stamps when the chest wound was inflicted. It is possible that if the chest wound were inflicted first that Stamps might have remained standing and able to speak.

Goodrum presented evidence that after the shooting Murray had told some people that earlier in the evening Stamps stated he thought he was going to die that night and purposely drove into ongoing [sic] traffic and hit a light pole, in an effort to kill them both. She said Stamps was upset about being terminated from the drug rehabilitation program and was afraid if he "got a dirty test" he would be sent back to jail. He told her he was not going

back to jail; they would have to kill him first. She also said Stamps had grabbed a pipe and had advanced toward Goodrum. Murray denied making any of these statements.

(Lodgment No. 7, ECF No. 76-15 at 2-5.)

### III.  PROCEDURAL BACKGROUND

On December 27, 2002, the San Diego District Attorney's Office filed an Information charging Tony Goodrum with one count of murder, a violation of California Penal Code § 187(a), and one count of possession of a firearm by a felon, a violation of California Penal Code § 12021(a)(1). (Lodgment No. 1, vol. 1, ECF No. 76-1 at 0001-02.) The Information also alleged Goodrum personally used and discharged a firearm, within the meaning of California Penal Code §§ 12022.5(a)(1) and 12022.53(d). (*Id.* at 0002.) Following a jury trial, Goodrum was found guilty of voluntary manslaughter; the jury also found the firearm allegations to be true. (*Id.* at 0201-03.)[2] Goodrum was sentenced to twenty-one years in prison. (Lodgment No. 1, vol. 2 at 276, ECF No. 76-2 at 54-55.)

Goodrum appealed his conviction to the California Court of Appeal. (Lodgment No. 4, ECF No. 76-12.) The state appellate court upheld Goodrum's conviction in a written, unpublished opinion. (Lodgment No. 7, ECF No. 76-15.) Goodrum filed a petition for review in the California Supreme Court, which was summarily denied. (Lodgment Nos. 8-9, ECF Nos. 76-16, 76-17.)

On August 4, 2005, Goodrum filed a petition for writ of habeas corpus in the San Diego Superior Court. (Lodgment No. 10, ECF No. 76-18.) The superior court denied the petition in a written opinion. (Lodgment No. 11, ECF No. 76-19.) Goodrum then filed a petition for writ of habeas corpus in the California Court of Appeal. (Lodgment No. 12, ECF No. 76-20.) Respondent filed an informal response to the petition in

---

[2] Just prior to the close of the prosecution's rebuttal case, Goodrum pleaded guilty to count two, possession of a firearm by a felon. (Lodgment No. 3, vol. 6, ECF No. 76-10 at 32.)

compliance with the appellate court's order, and Goodrum filed an opposition. (Lodgment Nos. 14-15, ECF No. 76-22, 76-23.)  The Court of Appeal denied the petition in a written opinion.  (Lodgment No. 16, ECF No. 76-24.)  Goodrum then filed a petition for writ of habeas corpus in the California Supreme Court.  (Lodgment No. 17, ECF No. 76-25.)

While Goodrum's petition was pending before the California Supreme Court, he filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court in case no. 07cv0752 IEG (JMA) on April 23, 2007, raising the claims he had exhausted on direct appeal, but not the claims contained in his pending state habeas corpus petition. (*See Goodrum v. Kramer*, So. Dist. Case No. 07cv0752 IEG (JMA).)  The California Supreme Court summarily denied Goodrum's habeas corpus petition on June 13, 2007. (Lodgment No. 18, ECF No. 76-36.)  Goodrum then attempted to add his newly exhausted claims to his petition in case no. 07cv0752 IEG (JMA) by filing an Application for Leave to File a Second or Successive Petition in the Ninth Circuit Court of Appeals. *See Goodrum v. Busby*, 824 F.3d 1188, 1190-91 (9th Cir. 2016).  Goodrum incorrectly interpreted the Ninth Circuit's denial of his application to mean that he was to finish litigating his case in this Court in case no. 07cv0752 IEG (JMA), then apply to the Ninth Circuit for leave to file a second or successive petition containing the claims he had exhausted via state habeas corpus.  *Id.* at 1191.

Meanwhile, in case no. 07cv0752 IEG (JMA), Respondent filed an Answer, a Memorandum of Points and Authorities in Support of the Answer, and a Notice of Lodgment on July 7, 2007.  (*See* ECF No. 9 in case no. 07cv0752 IEG (JMA).)  Goodrum filed a Traverse on July 27, 2007.  (*See* ECF No. 12 in case no. 07cv0752 IEG (JMA).) A Report and Recommendation (R&R) recommending the petition in 07cv0752 IEG (JMA) be denied was filed on January 14, 2008, and the Court adopted the R&R on September 6, 2008.  (*See* ECF Nos. 15, 31 in case no. 07cv0752 IEG (JMA).)  The Court granted a limited Certificate of Appealability on the narrow issue of whether the state court erred in refusing to give a defense of habitation instruction.  (*See* ECF No. 39 in

case no. 07cv0752 IEG (JMA).)  The Ninth Circuit affirmed this Court's denial of the petition in case no. 07cv0752 IEG (JMA) on September 13, 2010.  (*See* ECF No. 51 in case no. 07cv0752 IEG (JMA).)

Following his understanding of the Ninth Circuit's instructions, Goodrum filed a second Application for Leave to File a Second or Successive Petition in the Ninth Circuit Court of Appeals on October 29, 2010, after his petition in case no. 07cv0752 IEG (JMA) was denied, and was granted leave to do so on August 31, 2011.  *Goodrum*, 824 F.3d at 1191.  Goodrum then filed the petition in this case on September 23, 2011.  (ECF No. 1.)

This Court concluded Goodrum had failed to meet the requirements of 28 U.S.C. § 2244(b)(2)(B) to proceed with a second or successive petition and dismissed the case. (ECF No. 25.)  A Motion for Relief From Judgment was denied on October 23, 2012. (ECF No. 39.)  Goodrum appealed to the Ninth Circuit on November 26, 2012, and the Ninth Circuit granted relief on June 9, 2016, remanding the case to this Court.  (ECF No. 64; *Goodrum*, 824 F.3d 1188.

Goodrum filed a Second Amended Petition and lodgments in this case on March 12, 2017, and Respondent filed an Answer and Memorandum of Points and Authorities in Support of the Answer on June 9, 2017.  (ECF Nos. 75-76, 83.)  Goodrum filed a Traverse on October 7, 2017.  (ECF No. 88.)

## IV.  **DISCUSSION**

In his Petition, Goodrum presents two grounds.  First, he contends the prosecutor presented perjured testimony at his trial.  Second, he claims trial counsel was ineffective in various ways.  He also asks for an evidentiary hearing or to supplement the record. (Pet., ECF No. 75 at 56-120.)  Respondent contends the state court's resolution of Goodrum's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer, ECF No. 83 at 19-48)

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application, of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the federal court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions, but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to

determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis*

Goodrum contends he is entitled to habeas corpus relief for two reasons. First, he claims the prosecution presented perjured testimony at his trial. Second, he contends his trial counsel was ineffective for several reasons. He also claims he is entitled to an evidentiary hearing. (Pet., ECF No. 75.)

1. *Use of Perjured Testimony*

In his first claim, Goodrum contends the prosecution presented perjured testimony to secure his conviction. Specifically, he claims the prosecutor and police coerced Howard Herring's testimony that Stamps did not have a pipe in his hands when Goodrum shot him. (Pet., ECF No. 75 at 53-66.) In support of this claim, Goodrum has submitted an affidavit in which Herring alleges he told the officer who interviewed him after the crime, Detective Maria Rivera, that Stamps had a pipe in his hand when Goodrum shot him but Rivera, Deputy District Attorney Cooper, and Sergeant Sergott later coerced him into testifying falsely that he did not see the pipe in Stamps's hand. (Pet., ECF No. 75-3, Ex. B.) Respondent argues the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 83-1 at 19-34.)

As an initial matter, Goodrum contends the operative state court decision denying Goodrum's perjury claim is not entitled to deference because it was not a decision on the merits and this Court must therefore review the perjury claim de novo. (Pet., ECF No. 75 at 42-46.) Goodrum argues this is so because the operative state court decision, the state appellate court's opinion denying the claim, did not specifically mention any federal

cases and did not analyze the federal due process claim raised by Goodrum. (*Id.* at 67-69.) The cases Goodrum cites in support of this contention are inapposite. *See*, *e.g.*, *Bester v. Warden*, 836 F.3d 1331, 1336 (11th Cir. 2016) (state court rejected pro se petitioner's brief in its entirety and so did not address those claims on the merits); *Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012) (court misconstrued petitioner's claims and so did not address the merits); *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (pre *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir. 2002) (§ 2254 presumption applies where state court issues a summary disposition); *Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001) (state court's ruling did not apply either state or federal governing law). As Respondent correctly argues, the Supreme Court has clearly stated a state court need not cite Supreme Court precedent or even be aware of Supreme Court cases when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8; *Harrington*, 564 U.S. at 98. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *Early*, 537 U.S. at 8, the state court decision will not be "contrary to" clearly established federal law. *Id.* Moreover, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. No such indications or state-law procedural principles are present in Goodrum's case. Therefore, the relevant state court decision here, the California appellate court opinion denying the perjury claim, *see Ylst*, 501 U.S. at 805-06, is a decision on the merits.

Goodrum also argues the perjury claim must be reviewed de novo because the state court applied the wrong harmless error standard when it denied Goodrum's perjury claim. Claims alleging the use of perjured testimony are governed by *Napue v. Illinois*, 360 U.S. 264 (1959). "A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Jackson v. Brown*, 513 F.3d

1057, 1071-72 (9th Cir. 2008) (citation omitted). If there is "'any reasonable likelihood that the false testimony could have affected the judgment of the jury'" the conviction must be set aside. *Id*. at 1076 (quoting *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005)). The state appellate court denied Goodrum's perjured testimony claim as follows:

> Goodrum's assertions are speculative and not supported by the record or by his exhibits. Goodrum does not deny he shot Stamps twice with a rifle at close range. His theory of self-defense was rejected by the jury. Goodrum has not shown that absent the purported errors by counsel he would have obtained a better result *or that there was a miscarriage of justice*.

(Lodgment No. 16, ECF No. 76-24 at 2) (emphasis added.)

At the outset, it is not entirely clear the state court was referring to the perjury claim when it determined Goodrum had not established a miscarriage of justice, but the Court will assume for the purposes of its analysis that it was. Given that assumption, Goodrum is correct that the state court used an improper harmlessness standard, the "miscarriage of justice" standard, to determine whether Goodrum had demonstrated materiality under *Napue*. California's "miscarriage of justice standard" is applied to errors of non-constitutional magnitude and asks whether "it is reasonably probable that a result more favorable to the appealing party *would* have been reached in the absence of the error." *People v. Watson*, 46 Cal. 2d 818, 836 (1956) (emphasis added). *Napue* asks whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076 (emphasis added). The Ninth Circuit has concluded the *Watson* standard is more difficult for a defendant to meet than the *Napue* standard, and a state court's decision applying the *Watson* standard to a *Napue* claim is therefore "contrary to" clearly established Supreme Court law. *Dow v. Virga*, 729 F.3d 1041, 1048-49 (9th Cir. 2013). Accordingly, the Court will review Goodrum's perjury claim de novo. Because this Court's review is de novo, it may consider Respondent's lodgments irrespective of whether they were presented to the state courts. *See Murray v. Shiriro*, 745 F.3d 984, 1000 (9th Cir. 2014) ("After *Pinholster*, a federal

habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).")

Herring's affidavit narrates his encounter with three law enforcement officials, Detective Maria Rivera, District Attorney Investigator Edward Sergott and Deputy District Attorney Nicole Cooper. He claims all three of these individuals pressured and threatened him and that, as a result, he committed perjury while testifying for the prosecution at Goodrum's trial. Had he told the truth at the trial, he alleges, he would have testified that Stamps had a pipe in his hand when Goodrum shot him and that Stamps swung the pipe at Goodrum just before he was shot. (Pet., Ex. B, ECF No. 75-3 at 2.) Goodrum claims the prosecution knew about Herring's perjury and that had Herring testified truthfully, the jury would not have convicted him of voluntary manslaughter, but rather would have found that Goodrum committed justifiable homicide. (Pet., ECF No. 75 at 53-71.)

Herring was interviewed by Detective Rivera the day after the shooting. Although there is no written report, Rivera testified under oath at the preliminary hearing that Herring told her during this first interview that after Goodrum and Stamps fought in the garage, they appeared to calm down and Herring went into the house to eat and watch TV. (Lodgment No. 2, vol. 1, ECF No. 76-3 at 89-97.) At various times during the events preceding the shooting, Stamps threatened individuals at the house, threatened to get a gun and wielded a roofing hammer. (*Id.* at 92-97.) While he was inside the house, Herring heard a crashing sound and returned to the garage. (*Id.* at 97.) Stamps was threatening to kill Goodrum and another individual, Jason Cruz while Herring and others were telling Stamps to leave. (*Id.*) Goodrum went into the house, retrieved his rifle and pointed it at Stamps. (*Id.* at 98-99.) Rivera testified that Herring "first said [Stamps] had something in his hands . . . [which] he thought . . . was the metal pipe, but he wasn't sure." (*Id.* at 99.) According to Herring, Stamps began walking toward Goodrum while gesturing with his hands and Goodrum shot him. (*Id.* at 100.)

/ / /

Rivera interviewed Herring a second time on October 1, 2002. The interview was recorded. (Lodgment No. 22, ECF No. 76-22.) During this interview, Rivera specifically asked Herring whether Stamps had anything in his hands just prior to the shooting. (*Id.* at 39.) Herring first told Rivera that he was not sure. (*Id.* at 39-40.) The interview continued as follows:

> RIVERA: Okay, okay. So he comes out with that rifle and where's Dwayne [Stamps] standing at this time? Is he still over by that black sofa? Is he still over by that side of the car?

> HERRING: Well, well no he ah, he stepped back.

> RIVERA: He stepped back, okay, but you, you don't remember seeing him with anything in his hand . . .

> HERRING: At . . .

> RIVERA: . . . at this point?

> HERRING: Yeah, at that point I do.

> RIVERA: Okay, what, okay.

> HERRING: He has ah . . . maybe a metal pipe or something. I don't know if it . . .

> RIVERA: Okay, when I talked to you the first time, I interviewed you . . .

> HERRING: Yeah.

> RIVERA: . . . You said he never had a metal pipe in his hand and you never saw one.

> HERRING: I said that . . . I don't remember saying that. But I did see a metal pipe. I don't think I said that though.

> RIVERA: Yeah, I've got it, I've got it written down. You said . . . I specifically asked you about a metal pipe and you said you don't remember seeing one, and you don't remember Dwayne ever holding a metal pipe.

13

HERRING:  Well you'll have to show me that.

RIVERA:  Okay.

HERRING:  You'll have to show me that because I don't remember saying that.

RIVERA:  Um hum.

HERRING:  'Cause he had . . . I remember telling you something to the effect that whatever he had in his hand he ah . . . approached Tony in like, not a fast speed, but . . .

RIVERA:  Yeah, you said he just walked towards him, 'cause I asked you that time.  I said, "What was in his hand?"  And you said as far as you can remember he didn't have anything in his hands at that time.

HERRING:  Right, I probably did.

RIVERA:  Uh huh.

HERRING:  But ah . . .

RIVERA:  But you're . . . now that you recall it, so a little bit more when you're thinking about it?

HERRING:  Well . . .

RIVERA:  Uh huh.

HERRING:  I'll put it like this.

RIVERA:  Yeah.

HERRING:  When I came . . . when he was lying down, there was a metal pipe, there was, there was a metal pipe . . .

RIVERA:  Uh huh.

HERRING:  . . . that I specifically put up and away kinda, so the kids don't get it, not high or nothing, but kinda like put something in front of it.

RIVERA:  Yeah.

HERRING:  And ah . . .

. . . .

HERRING:  So he pretty much . . . at, at that time . . . Um . . . If he didn't have, if he didn't have . . . I said he didn't have nothing in his hand, he probably didn't have nothing in his hand until he rushed Tony or . . .

RIVERA:  Um hum.

HERRING:  . . . or something.  But I did see the pipe had been moved and it was by his side when I went to  . . . and looked at him to see if he was instantly dead or not.

RIVERA:  Oh, that was after he was shot?  You remember seeing the pipe by his side?

HERRING:  Yeah.

RIVERA:  Okay, but do you remember, do you remember him having it in his hands though before he was shot?

HERRING:  I mean no, I can't, I can't . . .

RIVERA:  You can't remember?

HERRING:  . . . say, you know, I can't say whether or not.

RIVERA:  Okay, Okay.  See that's pretty much what, what you said.  You don't remember him having anything in his hand. . .

HERRING: Yeah.

. . . .

HERRING:  And then the next thing I know, Dwayne turned around and started walking toward him, regular speed.

///

RIVERA: Just a regular normal walk. Are Dwayne's hands down or up? Do you remember?

HERRING: Well pretty much he's in an uproar right now. So his hands are going up and down, talking, cussing, all that.

RIVERA: What's in his hands when he's talking, his hands are going up and down and he's cussing and stuff?

HERRING: I don't see nothing in his hands.

(*Id.* at 40-46.)

At trial, Herring testified on direct examination that as Stamps began walking toward Goodrum, he was gesturing with his hands but did not have anything in his hands. (Lodgment No. 3, vol. 1, ECF No. 76-5 at 137-38.) He also repeated his statement that he had previously put the pipe, which he referred to as a pole, near the driver's side of the car in the garage near where Stamps was found after he was shot. (Lodgment No. 3, vol. 2, ECF No. 76-6 at 6-7.) On cross-examination, Herring stated first that he did not know where the pipe was at the time of the shooting. (*Id.* at 23.) Later, he testified he told police that Stamps "had a metal pipe or something." (*Id.* at 37.) Rivera testified at trial on cross-examination that Herring told her during his first interview that he "thought Dwayne had a metal pipe in his hand." (*Id.* at 152.) On redirect examination, Rivera said Herring told her he assumed Stamps had the pipe because it was lying next to him. (*Id.* at 154.)

In 2005, Herring executed a declaration which Goodrum has attached to his Petition as Exhibit B. In it, Herring notes that during his initial interview with Rivera on September 25, 2002, he lied to her and gave her his brother's name because there was a warrant out for his arrest. (Pet., ECF No. 75-3 at 1.) Herring claims that when he told Rivera during the September 25 interview that Stamps had a metal pipe in his hand and was hiding it behind himself when he was shot, Rivera "did not like" what he was saying and threatened to charge him with perjury if he continued to say Stamps had a pipe in his hand when he was shot. (*Id.* at 2.) Herring claims he was "therefore compelled to alter

[his] initial statement to indicate I didn't see a pipe in Mr. Stamps's hand and that Mr. Stamps 'turned' before the second shot." (*Id.* at 2-3.) Herring alleges that his statement that Stamps turned between the first and second shot was suggested by Rivera and that in fact the "turn" was Stamps swinging the pipe at Goodrum. (*Id.* at 3.) Herring also claims that at the October 1, 2002 taped interview, Rivera was hostile to him and again threatened to charge him with perjury if he insisted on stating that Stamps had a pipe in his hand when he was shot. (*Id.*) Herring states he was arrested shortly thereafter and he believes his arrest was Rivera's doing. (*Id.* at 3-4.)

Herring also claims that while he was in jail, District Attorney Edward Sergott visited him and told him that if he agreed not to testify in Goodrum's case, Sergott would get him out of jail and into a treatment program. (*Id.* at 4.) Herring agreed, and shortly thereafter he was released from jail and sent to Set Free Ranch, a rehabilitation center. (*Id.* at 4-5.) Herring assumed Sergott arranged for his release and rehabilitation stay. (*Id.*)

Herring alleges he was on a five-day pass for Christmas from Set Free Ranch when he was arrested again on an outstanding warrant. (*Id.* at 5.) According to Herring, Sergott and Cooper visited him in jail and told him that he would now have to testify because Sergott was obligated to serve him with a subpoena. (*Id.*) Herring was told he should not mention seeing the pipe in Stamps's hand when he testified. (*Id.*)

Herring contends he returned to Set Free Ranch on January 4, 2003 and that Sergott and Cooper visited him there in early February 2003. (*Id.*) According to the declaration, Sergott told Herring that "as long as [he doesn't] testify to the pipe being in Mr. Stamps's hand and that he [Stamps] attempted to attack Mr. Goodrum when Mr. Goodrum shot him," Rivera would not charge him with perjury. (*Id.*) Sergott and Cooper told Herring not to add opinions or "extra stuff" when he testified. (*Id.* at 5-6.)

The first element Goodrum must establish under *Napue* is that the testimony was actually false. *Jackson*, 513 F.3d at 1071-72. To begin with, Herring's veracity is in question because he has admitted he lied to Rivera about his identity. (Pet., Ex. B, ECF

No. 75-3 at 2.)  In addition, Herring claims Rivera "did not like the fact that [he] was telling her that Stamps had a pipe in his hand," and that during both the September 25, 2002 and the October 1, 2002, interviews, Rivera told him she would charge him with perjury if he insisted Stamps had a pipe in his hand at the time Goodrum shot him.  (*Id.* at 2-4.)  Rivera has consistently testified, however, not that Herring told her Stamps did not have a pipe in his hand, but rather that Herring was not sure whether Stamps had a pipe in his hand at the time of the shooting.  Rivera testified under oath at the preliminary hearing that Herring was equivocal about whether Stamps had anything in his hand, first saying that Stamps did have something in his hands which he "thought was the metal pipe," then later saying he was not sure.  (Lodgment No. 3, vol. 1, ECF No. 76-3 at 99.)  At trial, Rivera testified Herring told her during the first interview that he "thought Dwayne had a metal pipe in his hand."  (Lodgment No. 3, vol. 2, ECF No. 76-6 at 152.)  Moreover, contrary to Herring's claim, the transcript of the October 1, 2002 recorded interview does not contain a threat by Rivera to charge Herring with perjury nor a statement by Herring that Rivera was "making a mistake [because] Stamps did have the pipe!"  (Lodgment No. 13, ECF No. 76-22; Pet., Ex. B, ECF No. 75-3 at 3.)  The transcript does, however, contain Herring's equivocal statements about whether Stamps had the pipe in his hands at the time he was shot.  (*Id.* at 39-43.)  Further, Goodrum has provided no evidence, such as arrest records or court documents, to support Herring's claim that he was arrested at the behest of Rivera after his October 1, 2002 interview with her; rather, Herring simply speculates this occurred.  (Pet., Ex. B, ECF No. 76-3 at 3-4 ("I am confident that Maria Rivera made good on her promise to have me arrested.")  On the whole, the record does not support a conclusion that Rivera threatened Herring with perjury or had him arrested, which resulted in him testifying falsely.

Herring's allegations about Sergott's and Cooper's alleged threats are also without substantial support in the record before the Court.  Herring claims he was arrested sometime after his October 1, 2002 interview with Rivera and was in jail when Sergott first met him.  According to Herring, Sergott agreed to engineer his release from jail and

18

entry into a treatment center, Set Free Ranch, if Herring agreed he would not testify for Goodrum. (Pet., Ex. B, ECF No. 75-3 at 4-5.) But Herring only speculates Sergott did these things. (Pet., Ex. B, ECF No. 76-3 at 4-5 ("I assumed Mr. Sergott did speak to the judge [on] my behalf.") Moreover, Goodrum has provided no documentary evidence to either the state courts or to this Court which establishes when and why Herring was arrested, whether he was in custody at the times he claims and for what reasons, or when and under what circumstances he entered Set Free Ranch. Respondent has provided a report written by Sergott detailing this initial meeting with Herring. (See Resp'ts Lodgment No. 1, ECF No. 84-1.) In it, Sergott notes Herring told him he did not appear at the preliminary hearing because he was at Set Free Ranch. (*Id.* at 1.)

Herring's claims regarding Sergott's and Cooper's alleged visits to him in jail and at Set Free Ranch are somewhat consistent with the record. Herring claims Sergott and Cooper visited him in jail shortly after New Year's Day but before he was released on January 4, 2003. (Pet., Ex. B, ECF No. 76-3 at 5.) Sergott testified he met Herring for the first time on January 2, 2003, but he did not testify that Cooper was with him. (Lodgment No. 3, vol. 3, ECF No. 76-7 at 37.) Sergott's report confirms these facts. (Resp'ts Lodgment No. 1, ECF No. 84-1 at 1.) Herring also claims Sergott and Cooper visited him at Set Free Ranch in early February. (Pet., Ex. B, ECF No. 76-3 at 5.) This is also consistent with the record, as Cooper told the court at the preliminary hearing on February 20, 2003, that she had visited Herring at Set Free Ranch the week before and that Herring told her he would come to court to testify. (Lodgment No. 2, vol. 1, ECF No. 76-5 at 18.) Herring claims that during the visit at Set Free Ranch, Cooper and Sergott told him not to testify Stamps had a pipe in his hand and was attempting to attack Goodrum with it when he was shot because it would "piss off" Rivera and he could be charged with perjury. (Pet., Ex. B, ECF No. 76-3 at 5-6.) However, given what the transcript reflects Herring told Rivera at the October 1, 2002 interview, this "warning" could have been simply Cooper and Sergott reminding Herring what he had told Rivera during his interview with her.

On the whole, given Herring's questionable credibility and the lack of evidence to support several of Herring's claims, as well as evidence in the record contradicting some of Herrings' claims, Goodrum has not established Herring committed perjury at his trial at the behest of Rivera, Cooper or Sergott.

The second prong of *Napue* is whether the prosecutor knew or should have known about the alleged perjury. *Jackson*, 513 F.3d at 1071-72. Goodrum claims that: (1) Rivera threatened Herring with perjury charges if he testified Stamps had a pipe in his hand when Goodrum shot him; (2) Sergott visited Herring in jail and told him that if he did not testify in Goodrum's favor, Sergott would get him released from jail and into rehab; and (3) Sergott and Cooper visited Herring at Set Free Ranch and told him that if he did not testify Stamps had a pipe in his hand when Goodrum shot him, Rivera would not charge him with perjury. If believed, this is sufficient to satisfy the "knowledge" prong of *Napue*.

Even if Herring's affidavit is credited, however, and it is established he gave false testimony at trial and that Cooper knew or should have known about it, Goodrum must establish the false testimony was material, that is, there is a reasonable likelihood the false testimony could have affected the judgment of the jury. *Jackson*, 513 F.3d at 1071-72, 1076. Goodrum contends that if Herring had testified he saw Stamps with the pipe in his hand at the time Goodrum shot him, the jury could have concluded he had committed justifiable homicide and not voluntary manslaughter. (Pet., ECF No. 75 at 35-51.) In California, a killing committed in so called "perfect self-defense" is justifiable homicide. In order to prove perfect self-defense, a defendant must show he actually and reasonably believed a killing was necessary to defend himself from imminent danger of death or great bodily injury. *See People v. Elmore*, 59 Cal. 4th 121, 133-34 (2014). In contrast, voluntary manslaughter, of which Goodrum was convicted, is a killing committed with an actual but unreasonable belief it was necessary to defend oneself from imminent danger of death or great bodily injury. *People v. Blakely*, 23 Cal. 4th 82, 87-88 (2000).

///

Given the record in Goodrum's case, the Court concludes Goodrum has not met the materiality standard. First, evidence that Stamps had a pipe in his hand at the time of the shooting was presented to the jury. Herring testified on cross-examination that he told Rivera Stamps had a pipe in his hand when Goodrum shot him. (Lodgment No. 3, vol. 2, ECF No. 76-6 at 37.) Detective Rivera also testified Herring told her during the October 1, 2002 interview that he thought Stamps had a metal pipe in his hand at the time of the shooting. (Lodgment No. 3, vol. 2, ECF No. 76-6 at 152.) Sherlyn and Lewis Terry both testified Lorraine Murray, Stamps's girlfriend, told them that during the incident, Stamps grabbed a pipe and came after Goodrum with it. (Lodgment No. 3, vol. 5, ECF No. 76-9 at 13, 18.) Lloyd Griffin, a neighbor who saw the shooting from across the street, thought Stamps was moving toward Goodrum when Goodrum shot him. (Lodgment No. 3, vol. 5, ECF No. 76-9 at 24-29.) He also heard Goodrum say to police, "Yes, I shot him. He was coming at me with a pipe. What did you expect me to do?" (*Id.* at 34.) And Goodrum himself testified repeatedly that Stamps had a metal pipe in his hand and was raising it up as if to strike Goodrum with it when Goodrum shot him. (Lodgment No. 3, vol. 3, ECF No. 76-7 at 157-60, vol. 4, ECF No. 76-8 at 8-10, 12-13.)

Further, had Herring testified unequivocally that Stamps had a pipe in his hand, he would have been impeached with the inconsistencies between his testimony and his statements to Rivera, as well as the fact that he lied to the police about his identity. In addition, Sergott testified that Herring told him he "felt conflicted" about testifying because he was friends with both Stamps and Goodrum, and having "lost Mr. Stamps forever," he "didn't want to lose Mr. Goodrum as well." (Lodgment No. 3, vol. 3 at 37-38.) Sergott also testified that Herring told him Ieisa Wilson told Herring that he was "the only chance to get [Goodrum] out." (*Id.*) Sergott memorialized this statement in his report. (Resp'ts Lodgment No. 1, ECF No. 84-1 at 3.) Had Herring testified Stamps had a pipe in his hand when Goodrum shot him, Sergott's testimony would have significantly lessened the impact of Herring's testimony.

/ / /

Moreover, there was ample evidence presented which established Goodrum's belief in the need to defend himself against Stamps was actual but unreasonable. *Jackson*, 513 F.3d at 1071-72, 1076. Goodrum admitted he had been smoking methamphetamine for "at least" a few hours prior to the shooting. (Lodgment No. 3, vol. 4, ECF No. 76-8 at 20-21.) The jury could have reasonably concluded this affected his judgment during the incident and helped create an actual but unreasonable belief in the need to defend himself. Lorraine Murray, Stamps's girlfriend who was standing next to Stamps when he was shot, testified Stamps did not have anything in his hand when Goodrum shot him. (Lodgment No. 3, vol. 2, ECF No. 76-6 at 60, 62.) Millard Egan lived across the street from Goodrum's house. He could see directly into garage where the shooting took place and had a clear view. (Lodgment No. 3, vol. 3, ECF No. 76-6 at 47.) He testified he did not see anything in Stamps's hands. (*Id.* at 50.) He also saw Goodrum moving toward Stamps, but did not see Stamps move toward Goodrum. (*Id.* at 54.) Lloyd Griffin, who also lived across the street, testified that although he could not see Stamps's hand, he did not see anything protruding from Stamp's body nor did he see him swing anything. (Lodgment No. 3, vol. 5, ECF No. 76-9 at 37-38.) Leta Houle, a fingerprint analyst, testified that she examined ten fingerprints from the metal pipe found entwined with Stamps's legs. Of those ten prints, one was readable, but she was unable to match it to Goodrum, Stamps, Murray, or Herring. (Lodgment No. 3, vol. 3, ECF No. 76-6 at 31-32.)

In addition, the medical evidence supported a conclusion that Goodrum's belief in the need to defend himself was actual but unreasonable. Goodrum testified he shot Stamps once, Stamps made a sound like an exhalation of air, he shot him a second time, and then Stamps fell down. (Lodgment No. 3, vol. 3, ECF No. 76-7 at 191.) Christopher Stalwell, the medical examiner who determined Stamps's cause of death, testified a person who suffered the head wound would have been disabled immediately and would not have been able to speak or move after suffering the wound. (*Id*. at 118, 124.) He further testified that while the chest wound would ultimately have been fatal, Stamps

would have been able to talk and/or move after receiving it. (*Id*. at 257-63.) Thus, the first shot must have hit Stamps in the chest.[3] In addition, Stalwell testified the chest wound Stamps suffered had stippling and therefore was delivered at close range, no more than a few inches. The head wound, however, had no stippling and was thus delivered from a longer distance. (*Id*. at 256-60.) Stippling occurs when the weapon is within two feet of the victim. (*Id*. at 256.) According to Stalwell, the bullet entered Stamps's head from the side, near his right ear and traveled right to left into his brain. (*Id*. at 257-58.) Further, Eugene LaChimia, a firearms expert, testified about the rifle Goodrum used. In order to shoot the rifle a second time, a user must work a lever forward to eject the cartridge case, then work the lever back again to cock the gun, and finally re-aim the gun at the target. (Lodgment No. 2, vol. 2, ECF No. 76-2 at 168-69, 173.)

Taken together, the evidence supports a conclusion that Goodrum actually but unreasonably believed he needed to defend himself from Stamps. Goodrum shot Stamps in the chest at close range, and when Stamps either staggered or turned away from Goodrum, exposing the right side of his head, Goodrum shot him again, this time in the side of his head. (Lodgment No. 3, vol. 7, ECF No. 76-11 at 52-55.) This means that after the first shot to the chest, Goodrum should have been able to see that he had incapacitated Stamps sufficiently to end the threat because Stamps had turned away from him. Instead, Goodrum ejected a cartridge case, re-cocked the rifle and re-aimed it at Stamps again before firing a second time. Herring's testimony would not have changed these facts.

Although not directly related to his claim that Herring committed perjury at his trial, Goodrum also claims Cooper "made false representations to the court about Herring's whereabouts, and his police statements, at the preliminary hearing." (Pet., ECF No. 75 at 55.) He claims Cooper and Sergott prevented Herring from attending the

---

[3] Murray thought Stamps was hit in the head first then the chest. She said Stamps was shot, grabbed his chest and staggered and was then shot a second time. (Lodgment No. 3, vol. 2 at 61.)

preliminary hearing, then Cooper lied to the court by claiming she did not know Herring's whereabouts when he did not show up for the preliminary hearing. (Pet., ECF No. 75 at 56.) In fact, he alleges, Cooper and Sergott knew Herring was at Set Free Ranch because Sergott had arranged for Herring to be there. (*Id*.) He also contends Rivera testified falsely at the preliminary hearing by stating that Herring told her Stamps had nothing in his hands when he advanced on Goodrum. (*See* Pet., ECF No. 75 at 55-56.)

As to Goodrum's claims about Cooper and Sergott, as discussed above, Herring only speculates that Sergott got him released from custody and into Set Free Ranch. (Pet., Ex. B, ECF No. 76-3 at 4-5 ("I assumed Mr. Sergott did speak to the judge [on] my behalf.") And, as noted, Goodrum has provided no documentary evidence to either the state courts or to this Court which would establish when and why Herring was arrested, whether he was in custody at the times he claims and for what reasons, or when and under what circumstances he entered Set Free Ranch at that time.

As to Goodrum's claims regarding Rivera's testimony at the preliminary hearing, the transcript reflects that Rivera testified Herring told her he thought he saw Stamps with a pipe in his hand but was not sure, but at the moment of the shooting, Stamps did not have anything in his hands. (Lodgment No. 2, vol. 2, ECF No. 76-3 at 100, 103, 107-08, 110, 192-93.) This testimony is consistent with Rivera's taped interview with Herring on October 1, 2002. (Lodgment No. 14, ECF No. 76-22 at 40-42, 46.)

In sum, even assuming Herring's testimony at trial was false and the prosecution knew it was, Herring's testimony that Stamps had the pipe in his hand was not sufficiently material to satisfy *Napue*. Herring's testimony would have undoubtedly helped Goodrum's case, but given the evidence presented at trial as a whole, the Court concludes there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076. Had Herring testified, he would have been impeached with his prior statements to the police and Wilson, as well as with his relationship to Goodrum. Independent witnesses and medical evidence did not

support Goodrum's claim that Stamps had a pipe in his hand and was advancing on him when he shot Stamps, or that the second shot in particular was fired in self-defense. Accordingly, Goodrum is not entitled to relief as to this claim.

## 2. *Ineffective Assistance of Counsel*

Goodrum next alleges his trial counsel was ineffective for three reasons: (1) counsel failed to locate and interview Herring; (2) counsel failed to adequately challenge the prosecution's fingerprint expert; and (3) counsel failed to move to dismiss the case based on law enforcement's failure to preserve exculpatory evidence, i.e., the pipe found at the scene. (Pet., ECF No. 75 at 71-113.) Respondent contends the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 83-1 at 34-46.)

Goodrum raised these claims in a habeas corpus petition he filed in the California Supreme Court, which summarily denied the petition. (Lodgment No. 18.) Accordingly, this Court must "look through" to the state appellate court opinion denying the claims. That court found that Goodrum's claims were "speculative and not supported by the record or by his exhibits" and that he had not "shown that absent the reported errors by counsel he would have obtained a better result or that there was a miscarriage of justice." (Lodgment No. 16, ECF No. 76-24 at 2.)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. He must also show he was prejudiced by counsel's errors. *Id*. at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). Further, *Strickland* requires "[j]udicial scrutiny of counsel's

performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id*. at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id*. at 697.

Goodrum contends the deficient performance prong of his ineffective assistance of counsel claims is subject to de novo review because the state court only addressed the prejudice prong of *Strickland* in its decision. Further, Goodrum argues that because the state court used the wrong standard to determine prejudice, the ineffective assistance of counsel claims in their entirety must be reviewed de novo pursuant to 28 U.S.C. § 2254(d)(1). (Pet., ECF No. 75 at 71-80.) The state appellate court assumed deficient performance for the purpose of its analysis and determined that even if counsel made errors serious enough to implicate *Strickland*, Goodrum had not established prejudice. (Lodgment No. 16, ECF No. 76-22 at 2.) Goodrum is correct that de novo review is required for the deficient performance prong of *Strickland* if the state court did not address it and this Court does. *Porter v. McCollum*, 558 U.S. 30, 39 (2009). He also is correct that the standard the state court used to determine prejudice for Goodrum's ineffective assistance of counsel claims is not consistent with *Strickland*. *Strickland* requires a petitioner to show "a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, not simply that a petitioner "would have obtained a better result." (*See* Lodgment No. 16, ECF No. 76-22 at 2.) Accordingly, the Court will review Goodrum's ineffective assistance of counsel claims de novo. As noted above, *Strickland* states that the Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Strickland*, 466 U.S. at 697.

a. Failure to Locate and Interview Herring

Goodrum claims counsel was ineffective for failing to locate and interview Herring before the preliminary hearing. (Pet., ECF No. 75 at 80-94.) He contends that had

counsel done so, Herring would have testified at the preliminary hearing that Stamps was advancing on Goodrum with a metal pipe at the time Goodrum shot him. According to Goodrum, this would have changed the outcome of the preliminary hearing and he would not have been held to answer on the murder charge. (*Id.*) Although not entirely clear, Goodrum also appears to argue that had Herring been located and had testified at the preliminary hearing, he would not have testified as a prosecution witness at trial, but rather would have echoed Goodrum's version of events. As support for this claim, Goodrum has attached four letters he wrote to his attorney telling him where he thought Herring was and his concern that Herring was being influenced or hidden by police. (Pet., ECF No. 75-4 at 1-2.) One of the places Goodrum mentioned was Set Free Ranch. (*Id.*)

Respondent suggests there is no clearly established Supreme Court law establishing the standard for effectiveness of counsel at a preliminary hearing. (Answer, ECF No. 83-1 at 39.) A preliminary hearing is not required by the federal constitution. Where a state provides for such a hearing, however, it is a critical stage of criminal proceedings and a defendant is entitled to counsel. *Coleman v. Alabama*, 399 U.S. 1, 9 (1970); *see Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) (the right to counsel attaches at "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment") (internal quotations and citation omitted). A defendant has the right to effective assistance of counsel at critical stages of a criminal proceeding. *Lafler v. Cooper*, 566 U.S. 156, 164-65 (2012). The Court concludes, therefore, that *Strickland* is the appropriate framework within which to analyze Goodrum's claim.

Counsel stated on the first day of the preliminary hearing that he had subpoenaed and served Herring prior to the preliminary hearing and a warrant had issued that morning as a result of Herring's failure to appear. (Lodgment No. 2, vol. 1, ECF No. 76-3 at 224.) Counsel told the court he had made a "good faith effort" to locate Herring and that Herring was a "material witness for the preliminary hearing purposes as well as

perhaps some future proceedings." (*Id.*) The prosecutor told the court that Sergott had been searching for Herring for the preceding two weeks as well, and that it appeared Herring "[did] not want to be found at this point." (*Id.* at 225.) The court granted a continuance of one week to give defense counsel time to locate Herring. (*Id.* at 226.) At the resumed preliminary hearing, counsel told the court he "had some people looking for [Herring]," that "the police have had some people looking for him" and that "[t]here is no indication that we can find that he is in San Diego." (Lodgment No. 2, vol. 2, ECF No. 76-4 at 3.) Counsel also told the court that "everything is being done that we can think of, but he hasn't been located." (*Id.*)

The record reflects that counsel made a good faith effort to locate Herring. The letters provided by Goodrum as support for his claim that he told defense counsel where he thought Herring was are either not dated or have a date well past the trial in this case and thus do not establish when Goodrum told counsel where he thought Herring was. (*See* Pet., Ex. C, ECF No. 75-4 at 3-9.) Further, Herring's affidavit does not say that counsel never contacted him. (*See* Pet., Ex. B, ECF No. 75-3.) Moreover, there is no declaration from counsel as to what specific efforts he did or did not make to locate Herring or whether he spoke to him before trial, nor has Goodrum indicated what further efforts counsel should have made. Goodrum provided several locations he thought Herring was staying in the letters, one of which was Set Free Ranch. Goodrum has not established counsel did not try to find Herring at those locations and was simply unsuccessful as opposed to not attempting to contact him at all. Accordingly, Goodrum has not established that counsel's efforts were so lacking that they fell below an objective standard of reasonableness or that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 688-687.

Goodrum has also not established he was prejudiced by counsel's actions. *Strickland*, 466 U.S. at 688-87. As Respondent notes, the burden of proof at a preliminary hearing is much lower than at trial. The prosecution need only show "some

rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." *People v. Superior Court (Day)*, 174 Cal. App. 3d 1008, 1020 (1985) (citations omitted).  The question in *Day* was also whether there was insufficient evidence to bind the defendant over on a murder charge where there was substantial evidence of self-defense.  Day claimed the victim threatened to beat her and had done so in the past.  She claimed she shot the victim as he advanced on her.  *Id.* at 1012-13.  The physical evidence contradicted Day's story.  Because there was credible evidence to support both a murder charge and self-defense, the state appellate court concluded the trial court should have held Day to answer on the murder charge and left the question whether the defendant acted in self-defense for a jury to resolve.  *Id.* at 1021.

Similarly, in Goodrum's case, even if Herring had testified at the preliminary hearing that he saw the pipe in Stamps's hand at the time Goodrum shot him, there still would have been credible evidence of both malice and self-defense sufficient to bind Goodrum over on the murder charge.  Malice requires an intent to kill or the commission of an unlawful act, the natural and probable consequences of which are dangerous to human life, which is performed with conscious disregard for that danger.  *People v. Lara*, 9 Cal. App. 5th 296, 314-15 (2017).  Rivera testified Herring told her at the September 25, 2002 interview that after Goodrum and Stamps fought in the garage, Goodrum went into the house, retrieved his rifle, pointed it at Stamps and shot him twice.  (Lodgment No. 2, vol. 1, ECF No. 76-3 at 98-99.)  Lorraine Murray testified there was nothing in Stamps's hands when Goodrum shot him twice.  (*Id*. at 38-41.)  She also testified there was a pause between the two shots during which time Goodrum could have stopped his assault.  (*Id*. at 64.)  Lloyd Griffin testified he saw Stamps advance toward Goodrum and saw Stamps's hands up by his chest and could not see anything in Stamps's hands.  (*Id*. at 176-77, 180.)  He heard three rapid shots.  (*Id*. at 172.)  Bud Egan, a neighbor of Goodrum's, told investigator Sergott that he saw Goodrum pointing the rifle at Stamps, saw Goodrum advancing on Stamps, and that Stamps had nothing in his hands when

/ / /

Goodrum shot him.  (Lodgment No. 2, vol. 2 at 236-38.)  These facts support a possible finding of either express or implied malice.

On the other hand, Rivera also testified Herring told her Stamps threatened to kill Goodrum and another individual, Jason Cruz while Herring and others were telling Stamps to leave.  (Lodgment No. 2, vol. 1, ECF No. 76-3 at 89-97.)  Herring also told Rivera that Stamps was walking towards Goodrum when Goodrum shot him and Herring thought Stamps might have had a pipe in his hands but he was not sure.  (Lodgment No. 2, vol. 1, ECF No. 76-3 at 99-100.)  Griffin testified he heard Goodrum tell police that Stamps had come at him with a pipe.  (*Id.* at 184.)  Lewis and Sherlyn Terry both testified that Murray had told them Stamps had a pipe in his hand and was going after Goodrum with it when he was shot.  (*Id.* at 198, 208.)  Both Griffin and Egan heard rapid shots. (*Id.* at 172; Lodgment No. 2, vol. 2, ECF No. 76-4 at 17.)  These facts support a possible finding of self-defense.  Thus, even if Herring had testified at the preliminary hearing that he saw a pipe in Stamps's hand when Goodrum shot him, there is not "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the [preliminary hearing] would have been different," or a "probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694; *Fretwell*, 506 U.S. at 372

Goodrum also appears to argue counsel's failure to locate and interview Herring before the preliminary hearing and thereby secure Herring's favorable testimony resulted in Herring not being a defense witness at trial.  This is speculative, and counsel cannot be faulted for failing to pursue Herring as a defense witness once his statements to Rivera were known on the chance that he would become a favorable witness.  *Strickland*, 466 U.S. at 688.  Moreover, once it became clear from the preliminary hearing that Herring's statement to Rivera was not helpful to Goodrum's defense and that Herring would likely be a prosecution witness, counsel could have made a reasonable strategic decision that any further attempt to locate and enlist Herring for the defense could do more harm than

/ / /

good, and that it would be more helpful to Goodrum's defense if Herring simply did not show up at trial and testify for the prosecution. *Id.* at 697.

### b. Failure to Challenge Fingerprint Expert

Next, Goodrum contends counsel was ineffective for failing to effectively challenge the prosecution's fingerprint expert. (Pet., ECF No. 75 at 95-106.) Goodrum claims counsel should have sought an independent fingerprint analyst to determine whether any prints could be found on the pipe as well as to present evidence to the jury that when police threw the pipe on the lawn they could have destroyed or degraded any prints on it. (*Id.*) According to Goodrum, counsel could have used this information to challenge the prosecution's evidence that no identifiable prints were found on the pipe. (*Id.*) Goodrum has presented an affidavit by a fingerprint expert, Kurt Kuhn, which states that law enforcement's handling of the pipe likely destroyed or degraded any fingerprint evidence on the pipe and that any prints recovered from the pipe should have been run through more data bases. (Pet., Ex. A, ECF No. 75-2 at 16.) The affidavit also notes that when fingerprints are made in blood, it can be difficult to properly interpret fingerprint results. (*Id.*)

Respondent first argues that this Court is precluded from considering Kuhn's affidavit under *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) because it has never been presented to any state court. In addition, Respondent contends defense counsel did consult a fingerprint expert and that any argument that further investigation of whether there were any fingerprints on the pipe that would have helped the defense is speculation. (Answer, ECF No. 83-1 at 4-42.) Because the Court has concluded that the state court's denial of Goodrum's ineffective assistance of counsel claims did not use the proper standard to evaluate prejudice, and the Court's review is therefore de novo, the Court will consider the Kuhn affidavit in its analysis. *See Murray*, 745 F.3d at 1000.

Respondent is correct that it appears from the record that defense counsel did consult with an independent fingerprint analyst, contrary to Goodrum's claim that counsel only consulted with the prosecution's expert. As Respondent noted, exhibits and

lodgments Goodrum provided to the California Court of Appeal contain a letter from Goodrum's trial attorney which states the following:

> There is no written report from the fingerprint expert *from Arcana Forensic*. The only fingerprints found on the pipe, *after examination by both the police and my expert*, were the bloody prints left by the police officer who arrived at the scene. Both you, Stamps, and the female witness were eliminated as placing the prints on the pipe. She also examined Stamps'[s] clothing and agreed that the shooting was done at close range. I was present during the examination of the evidence.

(Lodgment No. 13, ECF No. 76-21 at 145) (emphasis added.)

Thus, contrary to Goodrum's claim, it appears counsel did consult with his own expert who concluded, like the prosecution's expert, that Stamps's fingerprints were not on the pipe.[4] Goodrum claims counsel should have more thoroughly questioned the prosecution's expert at trial to establish that Stamp's fingerprints *could have been found* on the pipe if police had not thrown it on the lawn. This, as Goodrum concedes, was a strategic decision and review of such a decision is "highly deferential." *Strickland*, 466 U.S. at 689. Counsel could have reasonably concluded there was not much to be gained by questioning the prosecutor's expert about the fingerprint evidence further because it would highlight to the jury the fact that Stamps's fingerprints were not found on the pipe. *Id.*

Nor was Goodrum prejudiced by counsel's failure to do more regarding the fingerprint evidence. He claims that had counsel cross-examined the fingerprint expert more vigorously about the possibility that any fingerprints that had been on the pipe were destroyed or degraded, this would have helped the defense by planting doubt in the jury's mind about the expert's conclusions. (Pet., ECF No. 104-06.) But in light of the other evidence presented at trial, even if the jury had concluded that Stamps's fingerprints *may*

---

[4] The prosecution's expert testified at trial, contrary to counsel's letter, that she did not compare the fingerprints to those of any law enforcement personnel. (Lodgment No. 3, vol. 3, ECF No. 76-7 at 3.) This does not change the fact, however, that the record establishes counsel did employ a fingerprint expert and that expert did not find Stamps's fingerprints on the pipe.

have been on the pipe, that is not sufficient for this Court to conclude that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," or "a probability sufficient to undermine confidence in the outcome." *Id.*; *Fretwell*, 506 U.S. at 372.

### c. Failure to Move to Dismiss for Failure to Preserve Evidence

Goodrum also contends counsel was ineffective for failing to move to dismiss the case due to law enforcement's failure to preserve exculpatory evidence, namely, the pipe, by throwing it on the lawn. (Pet., ECF No. 75 at 106-113.) Respondent argues Goodrum has not established either prong of *Strickland*. (Answer, ECF No. 83-1 at 42-46.)

In *California v. Trombetta*, the Supreme Court held that law enforcement has a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense." 467 U.S. 479, 488 (1984) (footnote omitted). "To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (internal citation omitted). The Supreme Court in *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988), held that due process "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Such a failure to preserve does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58. Goodrum argues counsel should have brought a motion to dismiss on either *Trombetta* or *Youngblood* grounds.

Officer Brian French, the first officer on the scene, saw Stamps lying in the garage and coughing up a large amount of blood. (Lodgment No. 3, vol. 3, ECF No. 76-7 at 19.) Stamps was lying on a "large amount of debris and clutter" including glass and "a metal pole that was underneath him, protruding form between his legs." (*Id.* at 20.) French tried to administer first aid. (*Id.*) Because Stamps was lying in a very narrow and

cramped area with a lot of debris, French and fellow officer Fischer tried to pull Stamps out of the garage area to continue with their first aid, but could not do so because of a metal pole tangled in Stamps's legs. (*Id*. at 22.) Fischer then grabbed the pole and threw it onto a grass area nearby. (*Id*. at 22-23.) As Fischer did so, Goodrum told Fischer that the pole was evidence. (Lodgment No. 2, vol. 1, ECF No. 76-3 at 19.) The pipe was preserved for testing, but Goodrum contends counsel should have moved for dismissal because police failed to preserve any fingerprint evidence from the pipe when they removed it from between Stamps's legs and threw it on the lawn while trying to give medical aid to Stamps. (Lodgment No. 3, vol. 3, ECF No. 76-7 at 22-23.)

Based on these facts, counsel could have made a reasonable, strategic decision that a *Trombetta/Youngblood* motion would not have been successful. *Strickland*, 466 U.S. at 688. The possible fingerprint evidence from the pipe did not have an exculpatory value that was apparent, but rather it was evidence that "could have been subjected to tests, the results of which might have exonerated [Goodrum]." *Trombetta*, 467 U.S. at 488; *Youngblood*, 488 U.S. at 58. Accordingly, in order to prevail on such a motion, counsel would have had to establish that any fingerprint evidence was destroyed by police in bad faith. *Youngblood*, 488 U.S. at 58. At most, the police conduct in Goodrum's case was negligent, and negligent police behavior does not rise to a due process violation. *Youngblood*, 488 U.S. at 58. For the same reason, Goodrum has not established he was prejudiced by counsel's failure to file such a motion. *Strickland*, 466 U.S. at 697. He has not shown the motion was meritorious nor a reasonable probability that the result of his trial would have been different. *Id*.; *see Kimmelman v. Morrison*, 477 U.S. 365, 374-75 (1986) (stating that to establish ineffective assistance of counsel for failing to file a motion to suppress evidence, a petitioner must show both that the motion was meritorious and a reasonable probability that the result of the proceeding would have been different).

3. *Request for an Evidentiary Hearing*

Goodrum asks for an evidentiary hearing in his case. (Pet., ECF No. 75 at 113-22.) Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially

restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
>
>> (A) the claim relies on --
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

In deciding whether to grant an evidentiary hearing, the court must first determine whether a factual basis exists in the record to decide Petitioner's claims. *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (quoting *Baja*, 187 F.3d at 1078). Where the issues raised by the Petitioner can be resolved by reference to the state court record, no evidentiary hearing is required. *Pinholster*, 563 U.S. at 183. The Court has conducted a de novo review of Goodrum's claims and has considered the state court record. As to Goodrum's perjury claim, the Court has concluded that even if Herring had testified consistent with his affidavit, Goodrum did not establish a *Napue* violation. As to his ineffective assistance of counsel claims, the Court has determined that counsel was not deficient and that, in any event, Goodrum was not prejudiced by counsel's alleged errors.

/ / /

Accordingly, he is not entitled to an evidentiary hearing because his claims can be resolved by reference to the state court record. *Id.*

## IV. <u>CONCLUSION</u>

The Court submits this Report and Recommendation to Chief United States District Judge Anthony J. Battaglia under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus and **DENYING** the request for an evidentiary hearing.

**IT IS ORDERED** that no later than **March 12, 2018** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 19, 2018**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: February 23, 2018 _____

Hon. Jan M. Adler
UNITED STATES MAGISTRATE JUDGE

11cv2262 AJB (JMA)