UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tony Goodrum,<br><br>                              Petitioner,<br>v.<br>Cynthia Y. Tampkins,<br>                              Respondent. | Case No.: 3:11-cv-2262-AJB-LL<br><br>**ORDER:**<br><br>**(1) ADOPTING THE REPORT AND RECOMMENDATION, (Doc. No. 91);**<br><br>**(2) DENYING THE SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS, (Doc. No. 75); AND**<br><br>**(3) DENYING CERTIFICATE OF APPEALABILITY** |

      Before the Court is Petitioner Tony Goodrum's ("Petitioner") Second Amended Petition for Writ of Habeas Corpus ("Petition"). (Doc. No. 75.) On February 23, 2018, Magistrate Judge Jan M. Adler issued a Report and Recommendation (the "R&R") recommending the Petition be denied. (Doc. No. 91.) On June 18, 2018, Petitioner filed objections to the R&R. (Doc. No. 96.) Respondent replied to the objections on June 28,

2018. (Doc. No. 97). For the reasons outlined below, the Court **ADOPTS** the R&R and **DENIES** the Petition.

I. BACKGROUND

The Court gives deference to state court findings of fact and presumes them to be correct. Petitioner may rebut this presumption, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding that findings of historical fact, including inferences properly drawn therefrom, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

> Goodrum lived with his girlfriend Ieisa Wilson, her two children, and another couple in a house on Brookhaven Road. Goodrum and the victim Dwayne Stamps, were friends. About a year earlier Stamps had rented a room in the Brookhaven house for a few months. In the past, Goodrum and Stamps had argued, even to the point of pushing or shoving each other, but they had never had a fist fight and Stamps had never made any threats to kill Goodrum or anyone else. Goodrum and Stamps had not seen each other for several months. Some animosity had developed between them because Stamps had borrowed and not returned Wilson's car (Wilson and Goodrum viewed it as a theft of Wilson's car).
>
> On September 24, 2002, Stamps had been terminated from a drug rehabilitation program, his girlfriend Lorraine Murray had complained about not being happy with the relationship, and he had backed her vehicle into a pole or tree, damaging it. After stopping at a bar, Stamps and Murray drove to the Brookhaven residence, arriving about 9:00 p.m. At the time of his death, about 30 minutes later, Stamps had a blood alcohol level of .17 percent.
>
> When Stamps and Murray arrived, the garage door to the Brookhaven residence was propped open six to seven inches with a pipe. The lights were on in the garage, which was often used by the residents of the house as an additional living space. Goodrum was inside the garage with a woman playing dominoes. Goodrum, the woman, and her friend had used methamphetamine that day "for a few hours at least."
>
> When Stamps knocked loudly on the garage door, Goodrum responded by opening the door. Stamps walked in and said he was looking for Jason Cruz who had his earring and other belongings. He was rude to the woman, suggesting in a lewd manner that he knew her and told her that if she saw Cruz to tell him that he was going to kill him.

Stamps entered the house, took Wilson into the bedroom and accused her of saying "mean things" about him. According to Wilson, Stamps threatened to kill her. When Goodrum entered the bedroom, Stamps accused Goodrum of having his diamond earring. Goodrum said the earring was in a duffel bag, which he took out of a closet, carried out to the garage, and set down in from of Murray's vehicle. Stamps and Goodrum argued in the garage and exchanged blows both in the garage and in front of Murray's vehicle. According to Goodrum, Stamps said he was going to get a gun and shoot everyone in the house.

Stamps went to Murray's vehicle and pulled out a roofing hammer, which was described as looking like a tomahawk, hatchet, or axe. According to Goodrum, Stamps threatened, "I'm gonna fuck you up. I'm gonna fuck you up." Goodrum pulled out a knife and picked up a trash can with his other hand. The men continued arguing but did not raise their weapons. Goodrum told Stamps to leave.

There were other people in the garage area, including the woman with whom Goodrum had been playing dominoes, Murray, and Goodrum's friend Howard Herring. According to some of the witnesses, things calmed down; both men put down their weapons, they hugged, Stamps apologized, and said he loved Goodrum as a brother. According to Goodrum, things did not calm down. Stamps made a comment that he was "gonna get [his] strap and shoot everybody in the house." Goodrum responded he was going into the house and when he came back he was "gonna be shootin' sparks." Goodrum retrieved a rifle from between the mattress and box springs of the bed in the master bedroom. He cocked the rifle in the bedroom.

When Goodrum entered the garage with the rifle, Stamps stood near the rear of the driver's side of a car parked in the garage. When Stamps became aware of the gun, he said something like, "Go ahead and shoot me." According to several witnesses, including neighbors, Stamps was not holding anything in his hands. A neighbor across the street saw Goodrum advance toward Stamps. Herring and Goodrum, as well as another neighbor, testified Stamps started walking towards Goodrum. Goodrum fired twice at Stamps, hitting him once in the head and once in the chest.

Herring testified that after the first shot, Stamps turned, grabbed his stomach and said something like, "I can't believe you shot me." Herring saw blood in the area of Stamps's heart. As Stamps turned, Goodrum fired a second shot and Stamps collapsed to the ground. According to Murray, the first shot hit Stamps in the face and he staggered. The second one hit him in the heart, he fell to the ground, and Goodrum was preparing to fire again when Murray shouted at him to stop.

> According to Goodrum, when he entered the garage, Stamps commented in a sarcastic or mocking tone of voice, "Oh, he's got a gun. What are you going to do with a gun?" Goodrum thought Stamps was hiding something behind his back, possibly a gun. Stamps kept advancing despite Goodrum's warning that he was "a damn good aim." Goodrum fired when Stamps started moving a pipe from behind his legs. After the first shot, Stamps continued to swing the pipe up, so Goodrum fired again. A pipe was later found near Stamps's body.
>
> Stamps died as a result of the gunshot wounds, either of which was potentially fatal. The head wound likely would have caused immediate unconsciousness and it would have been unlikely Stamps would have been able to speak or move after the wound was inflicted. The barrel of the rifle was two feet or further from the head wound when it was inflicted. In contrast, the barrel of the rifle was touching or nearly touching Stamps when the chest wound was inflicted. It is possible that if the chest wound were inflicted first that Stamps might have remained standing and able to speak.
>
> Goodrum presented evidence that after the shooting Murray had told some people that earlier in the evening Stamps stated he thought he was going to die that night and purposely drove into ongoing [sic] traffic and hit a light pole, in an effort to kill them both. She said Stamps was upset about being terminated from the drug rehabilitation program and was afraid if he "got a dirty test" he would be sent back to jail. He told her he was not going back to jail; they would have to kill him first. She also said Stamps had grabbed a pipe and had advanced toward Goodrum. Murray denied making any of these statements.

(Doc No. 76-15 at 2–5.)

## II. PROCEDURAL BACKGROUND

On December 27, 2002, the San Diego District Attorney's Office charged Petitioner with one count of murder, and one count of possession of a firearm by a felon. (Lodgment No. 1, Vol. 1, Doc. No. 76-1 at 1–2.) After a jury trial, Petitioner was convicted of voluntary manslaughter, the jury found the firearm allegations to be true, and Petitioner was sentenced to twenty-one years in prison. (*Id.* at 201–03.)

On September 23, 2011, Petitioner filed the Petition in this Court. (Doc. No. 1.) This Court concluded Petitioner had failed to meet the requirements of 28 U.S.C. § 2244(b)(2)(B) to proceed with a second or successive petition and dismissed the case. (Doc. No. 25.) A motion for relief from judgment was denied on October 23, 2012. (Doc.

No. 39.) Petitioner appealed to the Ninth Circuit on November 26, 2012, and the Ninth Circuit granted relief on June 9, 2016, remanding the case to this Court. (Doc. No. 64; *Goodrum v. Busby*, 824 F.3d 1188 (9th Cir. 2016).) Petitioner filed a Second Amended Petition and lodgments in this case on March 12, 2017, and Respondent filed an Answer and Memorandum of Points and Authorities in Support of the Answer on June 9, 2017. (Doc. Nos. 75–76, 83.) Petitioner filed a Traverse on October 7, 2017. (Doc. No. 88.)

## III. LEGAL STANDARDS

The Petition is governed by the AEDPA, applying a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 & n.7 (1997)). Federal habeas relief may be granted if the state court (1) applied a rule different from the governing law provided by the United States Supreme Court; or (2) correctly identified the governing legal principle, but unreasonably applied it to the facts of the case. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

The duties of the district court with respect to a magistrate judge's report and recommendation are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court must "make a de novo determination of those portions of the report . . . to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also United States v. Raddatz*, 447 U.S. 667, 676 (1980); *United States v. Remsing,* 874 F.2d 614, 617–18 (9th Cir. 1989).

As to portions of the report to which no objection is made, the Court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law. *Campbell v. U.S. Dist. Court,* 501 F.2d 196, 206 (9th Cir. 1974); *Johnson v. Nelson*, 142 F. Supp. 2d 1215, 1217 (S.D. Cal. 2001). Under such circumstances, the Ninth Circuit has held that a failure to file objections only relieves the trial court of its burden to give *de novo* review to factual findings; conclusions of law must still be reviewed *de novo. See Robbins v. Carey*, 481 F.3d 1143, 1146–47 (9th Cir. 2007).

## IV. DISCUSSION

Petitioner objects on three grounds. First, Petitioner argues the R&R improperly made a credibility finding without conducting an evidentiary hearing. (Doc. No. 96 at 12.) Second, Petitioner claims the R&R's analysis regarding Petitioner's ineffective assistance of counsel claim is erroneous. (*Id.* at 19.) Finally, Petitioner argues that he is entitled to an evidentiary hearing. (*Id.* at 28.)

### A. Howard Herring's Credibility

The Court will first address Petitioner's objection that the R&R found Howard Herring ("Herring") incredible without an evidentiary hearing. (*Id.* at 12.) First, Petitioner contends the prosecution presented perjured testimony of Herring to secure his conviction. (*Id.* at 8.) Specifically, Petitioner claims the prosecutor and police coerced Herring's testimony that Stamps did not have a pipe in his hands when Petition shot him, thereby defeating Petitioner's self-defense argument. (Doc. No. 75 at 53–66.) The R&R analyzed Petitioner's claim that Herring gave perjured testimony under the three-prong test in *Napue v. Illinois*, 360 U.S. 264 (1959). The R&R determined that under the first prong of *Napue*, Petitioner must establish that Herring's testimony was "actually false." (Doc. No. 91 at 17.) However, the R&R noted that given Herring's "questionable credibility and the lack of evidence to support several of Herring's claims, as well as evidence in the record contradicting some of Herrings' claims, Goodrum has not established Herring committed perjury at his trial at the behest of Rivera, Cooper or Sergott." (*Id.* at 20.) Petitioner objects, arguing the Magistrate Judge erred when he made a credibility determination as to Herring's credibility without conducting an evidentiary hearing. (Doc. No. 96 at 12.)

However, upon reviewing the R&R, the record, and the law *de novo*, the Court disagrees with Petitioner's characterization of the Magistrate Judge's findings. The R&R, in analyzing the first prong under *Napue*, was looking at whether the "testimony (or evidence) was actually false." (Doc. No. 91 at 10 (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008)).) The Magistrate Judge conducted such an analysis by reviewing the evidence contained in the record. The Magistrate Judge's conclusion did not

solely rest on Herring's credibility. Instead, the Magistrate Judge's conclusion that Petitioner could not demonstrate that Herring's testimony was "actually false" rests on the inconsistencies in the record, and the lack of evidence suggesting Herring's statements were in fact "actually false."

Specifically, Petitioner's claim that Herring's testimony was "actually false," and coerced is without evidentiary support in the record. (Doc. No. 91 at 20.) Petitioner fails to prove that Herring's testimony was "actually false" because the record reflects inextricable ambiguities and inconsistencies regarding Herring's testimony. *See Tapia v. Tansy*, 926 F.2d 1554, 1563 (9th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony."); *Williams v. Biter*, No. CV 10-0694 VAP FMO, 2012 WL 7687945, at *7 (C.D. Cal. Dec. 10, 2012), report and recommendation adopted, No. CV 10-0694 VAP SS, 2013 WL 990455 (C.D. Cal. Mar. 11, 2013) ("As an initial matter, petitioner has failed to show that Detective Koman's testimony on this issue was actually false. At most, petitioner has shown inconsistencies in Detective Koman's testimony. Mere inconsistencies in testimony, however, do not establish actual falsity.").

The evidence shows that these inconsistencies were prevalent. For example, Herring testified on direct examination at trial that as Stamps began walking toward Petitioner, he was gesturing with his hands but did not have anything in his hands. (Lodgment No. 3, Vol. 1, Doc. No. 76-5 at 137–38.) Herring also stated he had previously put the pipe near the driver's side of the car in the garage near Stamps' body. (Lodgment No. 3, Vol. 2, Doc. No. 76-6 at 6–7.) Then, on cross-examination, Herring testified first he did not know where the pipe was at the time of the shooting. (*Id.* at 23.) Later, Herring stated he told police Stamps "had a metal pipe or something." (*Id.* at 37.) The detective who interviewed Herring, Maria Rivera ("Rivera"), testified at trial on cross-examination that Herring told her during his first interview that he "thought [Stamps] had a metal pipe in his hand." (*Id.* at 152.) On redirect examination, Rivera said Herring told her he assumed Stamps had the

pipe because it was lying next to him. (*Id.* at 154.)

Furthermore, Herring states in his affidavit that Rivera threatened Herring with a perjury charge if Herring told the truth about Stamp holding a pipe. (Doc. No. 91 at 18.) But Rivera has never testified that Herring told her the victim was never holding a pipe. (*Id.*) Rather, Rivera has only stated that Herring was **unsure** whether the victim in fact had a pipe. (*Id.*) The record also does not supporting a finding that Rivera threatened Herring, and the Magistrate Judge points out evidence which actually contradicts Petitioner's claims. (*See id.* at 17–20.) As such, the R&R essentially further details Herring's unsupported claims and concludes that there is a lack of evidence in the record supporting his contentions. (*Id.*) Thus, the R&R found under the first prong of the *Napue* test that Herring's testimony did not appear to be false when made.

What the R&R does not do, however, is put this Court in the place of a fact-finder to make determinations about Herring's character in order to ascertain whether Herring's version of the events was false. The Court did not need to listen to live testimony to determine what the record already clearly established. Rather, the R&R's analysis leaned on the internal inconsistencies between Herring's affidavit and the facts in the record to conclude that Petitioner could not prove that Herring's testimony was actually false when made. Accordingly, the Court **OVERRULES** Petitioner's objections on this ground.

### B. Ineffective Assistance of Counsel Claims

Petitioner argued his counsel was ineffective for three reasons: (1) counsel failed to locate and interview Herring; (2) counsel failed to adequately challenge the prosecution's fingerprint expert; and (3) counsel failed to move to dismiss the case based on law enforcement's failure to preserve exculpatory evidence, i.e., the pipe found at the scene. (Doc. No. 91 at 25.)

In order to succeed on an ineffective assistance of counsel claim, a petitioner must establish two criteria: (1) counsel's performance was so deficient as to fall short of the guarantee of counsel under the Sixth Amendment, and (2) counsel's errors were so prejudicial that the petitioner was deprived of a fair trial. *Strickland v. Washington*, 466

8

U.S. 668, 687 (1984). This *Strickland* standard is highly deferential to trial counsel based upon the ease of second-guessing one's counsel after an adverse conviction or sentence is entered. *Id.* at 689. When analyzing an ineffective assistance of counsel claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* This standard is heightened when raised in a federal habeas petition. *Harrington*, 562 U.S. 86 at 100–01.

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. He must also show he was prejudiced by counsel's errors. *Id.* at 694. Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Strickland*, 466 U.S. at 697.

### 1. Counsel's Failure to Locate and Interview Herring

Petitioner claims counsel was ineffective for failing to locate and interview Herring before and after the preliminary hearing. (Doc. No. 75 at 80–94.) Petitioner contends that had counsel done so, Herring would have testified at the preliminary hearing that Stamps was advancing on Petitioner with a metal pipe at the time Petitioner shot him, thereby providing Petitioner with a viable self-defense argument. (*Id.*) Therefore, according to Petitioner, this would have changed the outcome of the preliminary hearing and he would not have been held to answer on the murder charge. (*Id*.) The R&R concluded that there was no basis for an ineffective assistance of counsel claim based on allegations of counsel's failure to locate and interview Herring. (Doc. No. 91 at 26–31.) Petitioner objects to the R&R, arguing that not only should Herring have been secured for the preliminary hearing,

but that "Goodrum's claim is much broader. Goodrum has made clear that his trial counsel was deficient not only in failing to locate Herring for the preliminary hearing but also that he was deficient in failing to investigate and interview Herring afterwards." (Doc. No. 96 at 20.)

First, as to counsel's efforts to locate Herring before the preliminary hearing, counsel stated on the first day of the preliminary hearing that he had subpoenaed and served Herring prior to the preliminary hearing and a warrant had issued that morning as a result of Herring's failure to appear. (Lodgment No. 2, Vol. 1, Doc. No. 76-3 at 224.) Counsel told the court he had made a "good faith effort" to locate Herring and that Herring was a "material witness for the preliminary hearing purposes as well as perhaps some future proceedings." (*Id*.) The prosecution also claimed to not have been able to locate Herring and that he "[did] not want to be found at this point." (*Id.* at 225.) Despite these attempts, the court still granted a one-week continuance to give the defense time to locate Herring. (*Id.* at 226.) Petitioner contends he provided locations for his attorney to search for Herring. (Doc. No. 75-4 at 3–9.) But this does not necessarily prove counsel did not search for Herring in the places mentioned by Petitioner. Given the totality of the circumstances, and counsel's efforts, Petitioner fails to prove that the attorney did not act as a reasonable attorney in trying to locate Herring. After the attempts to subpoena and locate Herring, there was no "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Second, Plaintiff objects that counsel "failed to hire an investigator" and "failed to interview Herring" after the preliminary hearing. (Doc. No. 96 at 20.) But once it became clear from the preliminary hearing that Herring's statement to Rivera was unfavorable to Petitioner's defense, counsel could have made a reasonable strategic decision that any further attempt to locate Herring for the defense could be harmful. Therefore, counsel could have determined strategically that Petitioner's case was stronger if Herring was not located or investigated and did not testify for either the defense or the prosecution. *Strickland*, 466

U.S. 668, 691 (1984) ("In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Silva v. Yates*, No. 07CV537-WQH (JMA), 2008 WL 2339498, at *19 (S.D. Cal. June 5, 2008) (stating that "counsel's decision not to hire a private investigator was reasonable."). Accordingly, because there were no errors made in this circumstance, the Court need not consider whether Goodrum was prejudiced by his attorney in failing to successfully locate Herring. Petitioner's objections are **OVERRULED**.

### 2. Counsel's Failure with Fingerprint Expert

Petitioner claims counsel was ineffective for failing to effectively challenge the prosecution's fingerprint expert. (Doc. No. 75 at 95–106.) Petitioner contends counsel should have sought an independent fingerprint expert to determine whether any fingerprints could be found on the pipe. (*Id.*) Petitioner also presented an affidavit by a fingerprint expert, Kurt Kuhn, which states that law enforcement's handling of the pipe likely destroyed or degraded any fingerprint evidence on the pipe, and that any prints recovered from the pipe should have been run through more data bases. (Doc. No. 75-2 at 16.) Respondent contends defense counsel did consult a fingerprint expert and any argument that further investigation of whether there were fingerprints on the pipe would have helped the defense is simply speculation. (Doc. No. 83-1 at 4–42.)

The Magistrate Judge ultimately agreed with Respondent, and Petitioner objected on the ground that this Court has previously noted, "the expert to which counsel referred was actually the prosecution's witness, and she never said the print located on the weapon belonged to an officer." *Goodrum v. Hoshino*, No. CIV. 11-2262 IEG JMA, 2013 WL 499861, at *9 (S.D. Cal. Feb. 8, 2013). Petitioner thus objects that there is a factual issue as to whether counsel consulted with his own expert or not. (Doc. No. 96 at 24.) But contrary to Petitioner's claim that counsel only consulted with the prosecution's expert, it appears from the record that defense counsel did consult with his own fingerprint analyst. As Respondent noted, exhibits and lodgments Petitioner provided to the California Court of Appeal contained a letter from Petitioner's counsel to Petitioner which states the

following:

> There is no written report from the fingerprint expert from Arcana Forensic. The only fingerprints found on the pipe, after examination by both the police ***and my expert***, were the bloody prints left by the police officer who arrived at the scene. Both you, Stamps, and the female witness were eliminated as placing the prints on the pipe. She also examined Stamps'[s] clothing and agreed that the shooting was done at close range. I was present during the examination of the evidence.

(Lodgment No. 13, Doc. No. 76-21 at 145) (emphasis added).

Petitioner claims the letter was referring to a prosecution witness, but yet the record does not reflect this position, and Petitioner does not support this position with any other evidence. In fact, the prosecution witness actually testified to the contrary that she did not compare the fingerprints to those of any law enforcement personnel. (Lodgment No. 3, Vol. 3, Doc. No. 76-7 at 3.) Thus, the evidence reflects that counsel for Petitioner did consult with an expert, but the expert merely confirmed that the only fingerprint found on the pipe was those of a law enforcement officer. *See Carpenter v. Kernan*, No. C 06-7408 JSW (PR), 2009 WL 3681684, at *14 (N.D. Cal. Nov. 2, 2009) ("First, Petitioner has not provided any evidence in his petition that shows that defense counsel did not investigate the possibility of calling a DNA and fingerprint expert whose testimony would be helpful to Petitioner."). Petitioner essentially expected counsel to either use unhelpful testimony from the expert or to keep perusing for other experts until someone more favorable appeared. But even if Petitioner's counsel had used this expert's opinion, it could have had a harmful effect on Petitioner's case because it showed that there were no fingerprints on the pipe. *See Hernandez v. Smith*, 100 F. App'x 615, 617 (9th Cir. 2004) ("There are several potentially sound tactical reasons for defense counsel's decision to forego having his fingerprint expert testify. Defense counsel may have believed the expert witness's equivocal testimony would do more harm than good.").

Petitioner also claims that if counsel cross-examined the fingerprint expert more vigorously about the possibility that any fingerprints that had been on the pipe were destroyed or degraded, this would have helped the defense by planting doubt in the jury's

12

3:11-cv-2262-AJB-LL

mind about the expert's conclusions. (Doc. No. 96 at 32.) However, based on the other evidence presented at trial, even if the jury had concluded that Stamps' fingerprints *may have possibly* been on the pipe but was destroyed, that is not sufficient for this Court to conclude that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," or "a probability sufficient to undermine confidence in the outcome." *Id*.; *Fretwell*, 506 U.S. at 372. This is especially true because the conclusion that it was *possible* that the fingerprint of Stamps existed on the pipe would have been based on pure speculation.

Therefore, there was no error or prejudice by counsel in his decision to not use the expert's analysis of the pipe. Nor was there error or prejudice in not questioning the expert in accordance to Petitioner's standards. Petitioner's objection is therefore **OVERRULED**.

### 3. Counsel's Failure to Move to Dismiss for Failure to Preserve Evidence

Lastly, Petitioner protests that counsel was ineffective for failing to move to dismiss the case due to law enforcement's alleged failure to preserve exculpatory evidence, namely, the pipe, by tossing the pipe onto a wet lawn. (Doc. No. 75 at 106–13.) The R&R found that there was no bad faith failure on the part of law enforcement to preserve evidence. (Doc. No. 91 at 33.) Petitioner objects to the R&R's conclusion, and reiterates that "[i]n light of the apparent value of the [metal pipe], which was known to [law enforcement at the scene], [their] actions . . . are sufficient to establish that [they] made 'a conscious effort to suppress exculpatory evidence,' thereby acting in bad faith." (Doc. No. 96 at 27 (quoting *United States v. Zaragoza-Moreira*, 780 F.3d 971, 980 (9th Cir. 2015).)

The state's loss or destruction of potentially exculpatory evidence violates due process when the evidence "possess[es] an exculpatory value that was apparent before the evidence was [lost or] destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not

constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (per curiam). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n. *; *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). Even negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process. *Youngblood*, 488 U.S. at 58. "Bad faith requires more than mere negligence or recklessness." *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).

The facts from the record do not demonstrate that the officers failed to preserve potentially useful evidence in bad faith. The first officer on the scene, Officer Brian French, saw Stamps lying in the garage and coughing up a large amount of blood. (Lodgment No. 3, Vol. 3, Doc. No. 76-7 at 19.) Stamps was lying on a "large amount of debris and clutter" including glass and "a metal pole that was underneath him, protruding form between his legs." (*Id.* at 20.) Officer French tried to administer first aid to Stamps. (*Id.*) Because Stamps was lying in a very narrow and cramped area with a lot of debris, Officer French and Officer Fischer tried to pull Stamps out of the garage area to continue with their first aid, but could not do so because of a metal pole tangled in Stamps' legs. (*Id.* at 22.) Officer Fischer then grabbed the pole and threw it onto a grass area nearby. (*Id.* at 22–23.) As Officer Fischer did so, Petitioner told Officer Fischer that the pole was evidence. (Lodgment No. 2, Vol. 1, Doc. No. 76-3 at 19.) The pipe was preserved for testing, but Petitioner contends counsel should have moved for dismissal because police failed to preserve any fingerprint evidence from the pipe when they removed it from between Stamps' legs and tossed it onto the lawn. (Lodgment No. 3, Vol. 3, Doc. No. 76-7 at 22–23.)

At best, Petitioner, has only established that Officer Fischer's actions in tossing the poll while trying to save Stamps was negligent. Petitioner argues that Officer Fischer knew that the pipe was potentially exculpatory evidence because Petitioner told him so.

(Lodgment No. 2, Vol. 1, ECF No. 76-3 at 19.) However, Petitioner ignores a critical fact. Officer French's testimony makes clear that while in the garage, after Officer Fischer tossed the pole onto the lawn, "[Petitioner] said something like, 'that pole is evidence. That pole there was evidence" *after [Officer Fischer] threw it*." (*Id.*) This testimony demonstrates that the officers were not on notice about the nature of the potential evidence on the pole until *after* they began administering aid to Stamps, and *after* Petitioner alerted the officers of the potential evidentiary value of the pole. Thus, Petitioner cannot establish the officers' "knowledge of the exculpatory value of the evidence *at the time* it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n. * (emphasis added). Based on these facts, counsel could have made a reasonable, strategic decision that a motion to dismiss based on the failure to preserve exculpatory evidence would not have been successful. *See Strickland,* 466 U.S. at 688.

### C. Evidentiary Hearing

Petitioner requests an evidentiary hearing under 28 U.S.C. § 2254(e)(2). (Doc. No. 75 at 113–22.) Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The district court may not grant an evidentiary hearing unless the petitioner's claim relies on (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court" or "a factual predicate that could not have been previously discovered through the exercise of due diligence" and (2) the underlying facts would sufficiently "establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). Where the issues raised by the Petitioner can be resolved by reference to the state court record, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011).

Here, the Court has conducted a *de novo* review of Petitioner's claims and has considered the state court record. This Court concludes there was no *Napue* violation in regards to Petitioner's perjury claim. This Court also concludes that Petitioner did not

15

3:11-cv-2262-AJB-LL

establish an ineffective counsel claim. Accordingly, he is not entitled to an evidentiary hearing because his claims can be resolved by reference to the state court record. *Id.*; *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (if record refutes petitioner's factual allegations or otherwise precludes relief, an evidentiary hearing is not required); *Gandarela v. Johnson*, 286 F.3d 1080, 1087 (9th Cir. 2002) (evidentiary hearing properly denied where petitioner "failed to show what more an evidentiary hearing might reveal of material import").

### D. Certificate of Appealability

When a district court enters a final order adverse to the applicant in a habeas corpus proceeding, it must either issue or deny a certificate of appealability, which is required to appeal a final order in a habeas corpus proceeding. 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability is appropriate only where the petitioner makes "a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing 28 U.S.C. § 2254(d)(2)). Under this standard, the petitioner must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Here, the Court finds that reasonable jurists could not debate the Court's conclusion to dismiss Petitioner's claims and therefore **DECLINES** to issue a certificate of appealability.

### V. CONCLUSION

Based on the foregoing, the Court **OVERRULES** Petitioner's objections, (Doc. No. 96), **ADOPTS** the R&R in its entirety, (Doc. No. 91), **DENIES** Petitioner's Second Amended Petition, (Doc. No. 75), and **DECLINES** to issue a certificate of appealability.

**IT IS SO ORDERED.**

Dated: September 30, 2019

Hon. Anthony J. Battaglia
United States District Judge